**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BILLIE N. SMITH,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-cv-00826-RDP** |
| | } | |
| **AVON PRODUCTS, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

This case is before the court on the Motions to Dismiss for Lack of Jurisdiction filed by

Defendants Cyprus Amax Minerals Company, Cyprus Mines Corporation (collectively "the

Imerys Defendants"), and Imerys Talc America Inc.[1]  (Doc. # 69) and Defendant Johnson &

Johnson (hereinafter "J&J") (Doc. # 71). Following a period of limited jurisdictional discovery,

the Motions have been fully briefed (Docs. # 70, 72, 87-88, 98-99) and are ripe for decision.

After careful review, and for the reasons explained below, the court concludes that the Motions

to Dismiss (Docs. # 69, 71) are due to be granted.

**I.      Background**

This lawsuit arises out of Plaintiff Billie N. Smith's alleged contraction of mesothelioma

following her exposure to multiple talc body products that allegedly contained asbestos. (Doc. #

1 at ¶¶ 1-3). Plaintiff used the products on herself and on her son, who has a mental disability, at

---

[1] On February 14, 2019, Defendant Imerys Talc America, Inc. filed a Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings. (Doc. # 100). Pursuant to Section 362 of the Bankruptcy Code, this case is due to be stayed with respect to Imerys Talc America, Inc., and the Motion to Dismiss for Lack of Jurisdiction filed by the Imerys Defendants (Doc. # 69) is due to be administratively terminated with respect to Imerys Talc America, Inc. The court's ruling on the Motion to Dismiss (Doc. # 69) shall apply only to the remaining Defendants, Cyprus Amax Minerals Company and Cyprus Mines Corporation, who, as noted above, are alone referred to herein as the Imerys Defendants.

her residence in Jefferson County, Alabama. (*Id*. at ¶¶ 6, 19). Specifically, Plaintiff avers that from the 1950's through 2015, she used Johnson's Baby Powder that was "designed, tested, produced, manufactured, marketed, distributed, sold, and/or supplied" by J&J and its subsidiary, Johnson & Johnson Consumer Inc. (hereinafter "JJCI"). (*Id*. at ¶¶ 18-19). She further claims that the Imerys Defendants supplied talc to J&J and JJCI during the relevant time period. (*Id*. at ¶ 20).

In her Complaint, Plaintiff alleges Defendants[2] are liable based on theories of negligence (Count One), wantonness (Count Two), and breach of warranty (County Three). She also contends that Defendants are liable under the Alabama Extended Manufacturer's Liability Doctrine (the "AEMLD") (Count Four). (*Id*. at 8-17). The Imerys Defendants and J&J have each filed motions to dismiss based upon lack of personal jurisdiction. (Docs. # 69, 71).

## A. The Imerys Defendants

Defendant Cyprus Amax Minerals Company ("CAMC") is a Delaware corporation with its principal place of business in Arizona. (Doc. # 70 at 2), and Defendant Cyprus Mines Corporation ("Cyprus Mines") is a wholly owned subsidiary of CAMC. (*Id*. at 2). Defendant Imerys Talc America, Inc. ("Imerys") is a Delaware corporation with its principal place of business in California. (*Id*. at ¶ 14). Imerys has registered with the Alabama Secretary of State to do business in Alabama. (*Id*.).

Plaintiff alleges the following jurisdictional facts with respect to the Imerys Defendants. From 1979 to May 2000, Defendants owned and operated a talc mine, mill, and pilot plant located in Alpine, Talladega County, Alabama. (Doc. # 87 at 7). In 1979, Defendant Cyprus Mines, through a wholly owned subsidiary, purchased the Alpine Mine and Mill. (*Id*.). In 1992,

---

[2] Plaintiff's Complaint originally named nine defendants: Avon Products Inc., Brenntag North America, Brenntag Specialties Inc., Cyprus Amax Minerals Company, Cyprus Mines Corporation, Imerys Talc America Inc., Johnson & Johnson, Johnson & Johnson Consumer Companies Inc., and Whittaker Clark & Daniels Inc. Defendants Avon Products Inc., Brenntag North America, and Brenntag Specialties Inc. have since been dismissed from the case. (Docs. # 51, 54, 67).

Cyprus Mines transferred the business to Cyprus Talc America. (*Id*.). Thereafter, Cyprus Talc America sold its talc operations to RTZ America, which changed its name to Luzenac America. (*Id*.). From 1992 to May 2000, Luzenac America owned and operated the Alpine Mine and Mill until it sold the facilities to an unrelated Alabama company. (*Id*.). For a few years in the early 2000s, Luzenac America continued to operate the Alpine Mine and Mill under a lease. (*Id*.). In August 2011, Imerys Minerals Holding, Ltd. (a UK entity) purchased Luzenac America, then renamed the entity Imerys Talc America—a defendant in this case, which has filed for bankruptcy protection. (*Id*. at 8). By 2011, the Alpine Mine and Mill was no longer in operation and its equipment was dismantled and shipped to Imerys's pilot plant in Sappington, Montana. (*Id*.). Most notably, Plaintiff asserts that from 1989 to the present, Defendants have supplied the majority of cosmetic grade talc used by J&J. (*Id*.).

In response, the Imerys Defendants argue that they are not subject to personal jurisdiction in Alabama because (1) Imerys never sold talc directly to J&J in Alabama and (2) CAMC never mined, milled, processed, or sold talc in Alabama or any other state. (Doc. # 70 at 2-3).

### B. J&J and JJCI

Defendant J&J is a New Jersey corporation with its principal place of business in New Jersey, and JJCI is a wholly owned subsidiary of J&J. (Doc. # 71-1). Plaintiff alleges the following jurisdictional facts with respect to J&J. In 1966, J&J purchased a talc mine in Vermont and created a company called Windsor Minerals to own and operate the mine. (Doc. # 88 at 6). In 1989, J&J entered into an agreement to sell the Windsor Mine to Cyprus Mines Corporation. (*Id*.). Part of that agreement obligated Cyprus Mines Corporation to supply cosmetic grade talc to JJCI. (*Id*.). The talc used in Johnson's Baby Powder was sourced from the Windsor mine, at least in part, until 2003. (*Id*.). Plaintiff also alleges that despite J&J's assertion that JJCI is the sole

entity responsible for Johnson's Baby Powder, J&J has continued to be the public voice for that product since the 1980s. (*Id*. at 7-12). Plaintiff seeks to establish personal jurisdiction over J&J based on its own conduct related to Johnson's Baby Powder within Alabama, or in the alternative, based on JJCI's contacts with Alabama through corporate veil-piercing principles.

J&J first argues that after January 2, 1979, it no longer designed, manufactured, marketed, or sold Johnson's Baby Powder (Doc. # 72 at 2). From January 2, 1979 forward, JJCI (under its current and former names) exclusively sold and distributed Johnson's Baby Powder. (*Id*. at 4). In fact, J&J submits that it did not design, manufacture, market, or sell any product in Alabama during any actionable time period in this case. (*Id*.). Applying Alabama's asbestos-specific "last exposure rule," J&J argues that Plaintiff's claims against it relating to the sale of Johnson's Baby Power before that date are time-barred. (*Id*. 2-5; Doc. # 98 at 3). J&J further submits that it cannot be subject to personal jurisdiction for any claim against it after January 2, 1979 because JJCI – an entirely separate corporate entity -- became the exclusive distributor of Johnson's Baby Powder.  (*Id*. 8-9; Doc. # 98 at 3).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(2), "[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). After the defendant challenges jurisdiction with affidavit evidence in support of its position, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless [the defendant's] affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Meier* ex rel. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). If, however, "the plaintiff's complaint

and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.*

## III.    Analysis

A federal court sitting in diversity "may exercise personal jurisdiction over a nonresident defendant to the same extent that [an Alabama] court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). Under its long-arm statute, "Alabama permits its courts to exercise jurisdiction over nonresidents to the fullest extent allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355-56 (11th Cir. 2000) (citing *Martin v. Robbins*, 628 So.2d 614, 617 (Ala. 1993)); *see also* Ala. R. Civ. P. 4.2 (permitting jurisdiction over nonresident defendants on any basis "not inconsistent with the constitution of this state or the Constitution of the United States"). Thus, this court may exercise personal jurisdiction over a defendant so long as jurisdiction is consistent with federal due process principles.

The Supreme Court has recognized two types of personal jurisdiction that are consistent with the Fourteenth Amendment's Due Process Clause—general jurisdiction and specific jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011). A defendant subject to general jurisdiction in a forum may be sued in that forum on any and all claims against it, even if the claims have no connection to the forum. *Id.* at 919. By contrast, a court has specific jurisdiction over a defendant only with respect claims that arise out of or relate to the defendant's contacts with the forum. *Id.* at 923-24.

Plaintiff does not argue that Defendants are subject to general jurisdiction in Alabama.[3] Therefore, the question the court must decide is whether J&J and the Imerys Defendants are subject to specific jurisdiction in Alabama for the claims asserted against them in this lawsuit.

The Eleventh Circuit follows a three-part test to determine whether specific jurisdiction over a defendant is proper. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). First, the plaintiff's claims must "arise out of or relate to at least one of the defendant's contacts with the forum." *Id.* (internal quotation marks omitted). Second, the nonresident defendant must have "purposefully availed himself of the privilege of conducting activities within the forum state." *Id.* (internal quotation marks omitted). Finally, if the plaintiff establishes the first two prongs, the defendant may still avoid jurisdiction by making "a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (internal quotation marks omitted). Here, Plaintiff has failed to establish specific personal jurisdiction over the Imerys Defendants and J&J.

### A. The Imerys Defendants are Not Subject to Personal Jurisdiction in Alabama

Plaintiff has failed to establish the first prong of the Eleventh Circuit's three-part specific jurisdiction test because she cannot show that her claims are related to any contacts the Imerys Defendants had with Alabama. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S.Ct. 1773, 1780 (2017). "[T]he *suit* must arise out of or relate to the defendant's contacts with the *forum*…In other words, there must be an

---

[3]  Indeed, any such allegation would be off the mark. For general jurisdiction to exist, a defendant's "affiliations with the State" must be "so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotation marks omitted). For example, corporations are subject to general jurisdiction where they are incorporated and have their principal place of business. *Id.* at 137. Plaintiff has alleged that (1) Cyprus Amax Minerals Company and Cyprus Mines Corporation are Delaware corporations with their principal places of business in Colorado; and (2) J&J is a New Jersey corporation with its principal place of business in New Jersey. (Doc. # 1 at ¶¶ 12-15) Thus, none of these Defendants are subject to general jurisdiction in Alabama.

affiliation between the forum and the underlying controversy, principally, [an] activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (emphasis in original) (internal quotations omitted).

The Imerys Defendants point to the testimony of their jurisdictional deponent, Patrick Downey and argue that Plaintiff has failed to establish that her claims arise out of or are related to their contacts with Alabama. Downey is the New Productions Development Engineering Director with Imerys Talc America, Inc. (hereinafter "Imerys") and an authorized representative of Cyprus Amax Minerals Company ("CAMC"). (Doc. # 70-1). His affidavit provides that Imerys "never sold talc directly to Johnson & Johnson in the State of Alabama," and CAMC has "never mined, milled, processed, manufactured, sold, supplied, or distributed talc." (*Id.* at 2). Thus, CAMC never sold talc to J&J in the State of Alabama or any other state. (*Id.* at 2).

Plaintiff responds by retracing the Imerys Defendants' involvement in the talc business in Alabama, including their ownership and operation of the Alpine Mine, Mill and Pilot Plant located in Talladega, Alabama. (*See generally* Doc. # 87). Specifically, Plaintiff alleges that from 1979 to May 2000, the Imerys Defendants used the Alpine Mine and Mill to produce talc for usage in "cosmetics and baby powder" and "talc produced at the Alpine Mill was tested for and/or by Johnson & Johnson for asbestos fibers in the talc." (*Id.* at 7). Plaintiff further alleges that from 1989 to present, the Imerys Defendants have supplied the majority of J&J's cosmetic grade talc. (*Id.* at 8).

However, the court agrees with the Imerys Defendants that a connection between the forum and Plaintiff's claims is lacking. Plaintiff has largely ignored the "unequivocal testimony" Patrick Downey gave in his deposition for this case. (Doc. # 99 at 1). While Downey readily

admitted that "some of the talc manufactured at Alpine were for cosmetic grades" (*Id*. at 2; Doc.

# 99-1 at 21), he clarified that no talc from Alpine was ever sold to J&J:

> A:    I'm aware of the products that we sold to Johnson & Johnson. Generally speaking, those grades were grade 66, grade 96 and grade 25.
>
> …
>
> A:    Grade 25 is a product that we manufacture at our facility in Houston, Texas that's been approved by Johnson & Johnson per their specification.
>
> …
>
> Q:    Okay. And what is grade 66?
>
> A:    Grade 66 is the talc grade of – that we manufacture or that Windsor Minerals actually was producing for Johnson & Johnson at the time Cyprus acquired Windsor Minerals from Johnson & Johnson. So it was a historic talc product that J&J subsidiary was manufacturing for themselves….
>
> Q:    Okay. And what is grade 96?
>
> …
>
> A:    Both grade 66 and grade 96 were manufactured at West Windsor, Vermont.
>
> Q:    And the talc that was manufactured at Windsor to become grade 96, did any of that talc come from the Alpine Mine?
>
> A:    No.
>
> Q:    How do you know that?
>
> A:    Because…to meet J&J's specification had to be pre-approved by Johnson & Johnson, and grade 66 and grade 96, the only approved sources for those grades were for mines in Vermont.
>
> …
>
> Q:    Okay. And 25 is manufactured since 2003 in Houston, where did the ore come from?
>
> A:    It was one specific grade of ore called Guangxi number 2 sourced from China.

(Doc. # 99 at 3-4; Doc. # 99-1 at 24-25).

Downey also confirmed that from 1989 to present, the Imerys Defendants supplied the majority of cosmetic grade talc used by J&J. (*Id*. at 4; *Id*. at 34). But, Downey explicitly stated that none of that talc came from the Alabama Alpine Mine and Mill.[4]

> Q:      Has the Alpine Mine ever been approved as a source of talc ore by J&J?
>
> A:      No.
>
> Q:      Was the Alpine Mill ever approved as the processing center, processing plant, by J&J?
>
> A:      No.
>
> Q:      Was any talc mined out of Alpine sold to J&J?
>
> A:      No.
>
> Q:      Was any talc milled at the Alpine plant sold to J&J?
>
> A:      No.

(*Id*.; *Id*. at 41). Again, Plaintiff has glossed over Downey's testimony that the only Imerys talc that was pre-approved by J&J came from Vermont, China, and briefly, Italy. (*Id*.; *Id*. at 42). Consequently, personal jurisdiction over the Imerys Defendants in Alabama is not appropriate here because Plaintiff has failed to establish that her claims are related to any of Defendants' contacts with Alabama.

---

[4] Plaintiff also takes issue with Downey's reliance on a summary of sales records he was given prior to his deposition. (Doc. # 87 at 15-17). According to Downey, the sales records show that no talc from the Alpine facility was sold to J&J. (*Id*. at 15; Doc. # 99-1 at 23-24). Plaintiff argues that the sales records are inadmissible pursuant to Federal Rule of Evidence 1006 because the Imerys Defendants failed to provide proper foundation for its admission, including the testimony of the witness who prepared it. (Doc. # 87 at 16). The court first notes that the Imerys Defendants have not explicitly cited to or relied on the sales summary in their briefing. Instead, they rest their arguments on Downey's testimony, who without referencing the sales summary, stated that he had personal knowledge of the products that were sold to J&J. (Doc. # 99-1 at 24). As discussed above, Downey explained that the only grades of talc J&J had pre-approved -- grades 66, 96, and 25 – were neither sourced nor manufactured at the Alpine Mine and Mill. (*Id*. 24-25). Based on this testimony derived from Downey's personal knowledge, the court concludes that it lacks personal jurisdiction over the Imerys Defendants.

Additionally, the court is not persuaded by Plaintiff's argument that, because they registered to do business in Alabama, the Imerys Defendants have voluntarily consented to the jurisdiction of Alabama courts. (Doc. # 87 at 12-15). Plaintiff claims that Imerys is currently registered as a foreign corporation doing business in Alabama, and its predecessors have been continuously registered since 1992. (*Id*. at 12). As Defendants correctly note, consent-by-registration is typically a "general jurisdiction argument because it is based on the premise that a foreign corporation can be sued in Alabama for contacts unrelated to the plaintiff's claims." (Doc. # 99 at 9); *see Johnston v. Foster-Wheeler Constructors, Inc.*158 F.R.D. 496, 501-503 (1994) (discussing defendant's corporate registration in the forum within the context of general jurisdiction). However, within the context of specific personal jurisdiction, procuring a license to do business in Alabama may "demonstrate that the Defendant has purposefully availed itself of the privilege of conducting activities within the forum." *Id*. at 503.

Here, neither theory of consent-by-jurisdiction saves Plaintiff's claims. First, Plaintiff has already conceded that Alabama does not have general jurisdiction over the Imerys Defendants because they are not at home within this forum. (Doc. # 87 at 3). Second, because Plaintiff cannot demonstrate that her claims arise out of or are related to Defendants' contacts with Alabama, the court need not address whether the Imerys Defendants purposefully availed themselves of the privilege of conducting business in Alabama. *See Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313-16 (11th Cir. 2018) (concluding that the exercise of specific jurisdiction over defendant would violate due process based on plaintiff's failure to establish jurisdictionally relevant contacts with the forum). Thus, the Imerys Defendants' Motion to Dismiss is due to be granted.

### B. J&J is Not Subject to Personal Jurisdiction in Alabama

In its Motion to Dismiss, J&J raises a hybrid challenge to Plaintiff's claims and argues that Alabama's asbestos-specific rules of accrual prevent this court from exercising personal jurisdiction over J&J. (*See generally* Doc. # 72). In response, Plaintiff contends that personal jurisdiction over J&J exists based on two alternative theories of liability: (1) J&J's own involvement with Johnson's Baby Powder after May 19, 1979 subjects it to personal jurisdiction in Alabama (Doc. # 88 at 6-8, 21-23) and (2) JJCI's contacts with Alabama should be imputed to J&J, the parent company, through corporate veil-piercing. (*Id*. at 23-25).

First, the court addresses the applicable rules of accrual and finds that any claims against J&J stemming from Plaintiff's exposure to asbestos before May 19, 1979 are time-barred. The court then turns to whether J&J's post-May 19, 1979 conduct subjects it to personal jurisdiction in Alabama. Finally, the court examines the parent-subsidiary relationship between J&J and JJCI and declines to pierce the corporate veil to impute JJCI's contacts with Alabama to J&J. Accordingly, for the reasons explained below, J&J's Motion to Dismiss for Lack of Jurisdiction (Doc. # 71) is due to be granted.

### i. Alabama's "Last Exposure" Rule Bars Any Claims Against J&J Relating to Asbestos Exposure Occurring Before May 19, 1979

Alabama has two different rules for accrual of personal injury actions relating to asbestos exposure. *Morgan v. Bill Vann Co.*, 2013 WL 4655756, at *4 (S.D. Ala. Aug. 30, 2013). All exposure claims pre-dating May 19, 1979 are subject to the "last exposure" rule, which grants plaintiffs one year from the last date of exposure to file suit. *See Garrett v. Raytheon Co.,* 368 So.2d 516, 521 (Ala. 1979). By contrast, the "discovery rule" promulgated in Alabama Code § 6–2–30(b) governs any claims relating to exposure after May 19, 1980, the date it took effect. The "discovery rule" mandates that a claim for exposure to asbestos accrues upon discovery of

an asbestos-related disease. *Morgan*, 2013 WL 4655756, at *4. Thereafter, the Alabama Supreme Court determined that the "discovery rule" would not apply retroactively to pre-1980 exposure claims. *Griffin v. Unocal Corp.*, 990 So.2d 291, 293 (Ala. 2008).

J&J points to the "last exposure" rule and argues that, because Plaintiff's exposure occurred before May 19, 1979, she had one year from the date of her last exposure to J&J's Baby Powder to file her suit. (Doc. # 72 at 2-5). J&J claims that Plaintiff's last date of exposure to J&J's product was necessarily January 2, 1979, because that is the date on which J&J stopped designing, manufacturing, marketing, and selling Johnson's Baby Powder. (*Id*. at 4). Thus, according to J&J, Plaintiff's claims expired on January 2, 1980 and are time-barred. (*Id*. at 4-5). J&J extends this reasoning to its personal jurisdiction challenge and maintains that it is not subject to specific jurisdiction in Alabama because it has not engaged in any post-May 19, 1979 conduct relating to the Plaintiff's alleged injury in the forum state. (*Id*. at 8-9). In other words, J&J asserts that any "timely" post-May 1979 claims Plaintiff could otherwise bring in this case cannot be asserted here because it no longer designed, manufactured, marketed, or sold Johnson's Baby Powder at the time any such claim accrued.

Plaintiff does not dispute that the application of the "last exposure" rule bars any claims against J&J related to the sale of Johnson's Baby Powder on or before May 19, 1979. (Doc. # 88 at 3). And, to be sure, the court agrees with the parties and finds that any claims against J&J relating to asbestos exposure before May 19, 1979 are time-barred by the "last exposure" rule. Whether J&J's post-1979 conduct subjects it to specific personal jurisdiction in Alabama is addressed below.

### ii. J&J's Post-May 19, 1979 Conduct Relating to Johnson's Baby Powder Does Not Create Personal Jurisdiction in Alabama

As previously discussed, the Eleventh Circuit follows a three-part test to determine whether specific jurisdiction over a defendant is proper: (1) the plaintiff's claims must "arise out of or relate to at least one of the defendant's contacts with the forum;" (2) the nonresident defendant must have "purposefully availed himself of the privilege of conducting activities within the forum state;" and (3) if the plaintiff establishes the first two prongs, the defendant may still avoid jurisdiction by making "a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

J&J has attached to its Motion to Dismiss the affidavit of Tina Snyder French, the Assistant Secretary of J&J. (Doc. # 71-1). French submits the following jurisdictional facts regarding J&J's lack of contacts with Alabama: J&J is a New Jersey corporation with its principal place of business in New Jersey; J&J is not licensed or registered to do business in Alabama; and J&J does not have any offices located in Alabama. (*Id*. at 2-3). With respect to the production and sale of Johnson's Baby Power, French confirms that J&J has not designed, manufactured, inspected, advertised, and/or sold Johnson's Baby Powder during any actionable period in this case (from May 19, 1979 to present). (*Id*. at 3). Specifically, it "never sold, distributed, or introduced Johnson's Baby Power into interstate commerce or into the State of Alabama during any actionable time period in this case." (*Id*.). Beginning in 1972, Johnson & Johnson Baby Products Company, a Division of Johnson & Johnson, became the responsible entity for Johnson's Baby Powder. (*Id*.). Thereafter, JJCI (formerly known as Johnson's Baby Products Company) became a subsidiary of J&J and took over the above activities. JJCI is a wholly owned subsidiary of J&J incorporated under the laws of New Jersey, with its principal

place of business in New Jersey. (*Id*.). Since January 2, 1979, JJCI has been the sole responsible entity for the design, production, and sale of Johnson's Baby Powder. (*Id*.).

In response, Plaintiff argues that this court has specific personal jurisdiction over J&J for her claims arising from her post-1979 exposure to Johnson's Baby Powder in Alabama for two reasons. First, she asserts that J&J was still involved in the manufacture, marketing, design, and sale of the product after May 19, 1979 (Doc. # 88 at 21-22). Specifically, she claims that J&J owned the talc mine where baby powder talc was sourced; J&J sourced the talc after the mine was sold; J&J helped create talc marketing policy and procedures; and J&J advertised Johnson's Baby Powder to the public. (*Id*.). Second, Plaintiff argues that J&J is subject to personal jurisdiction in Alabama because it supplied the allegedly defective talc until 1989. (*Id*. at 22-23). By contrast, J&J asserts that these activities were the sole responsibility of its subsidiaries, either Windsor Minerals or JJCI. (Doc. # 98 at 5-8). Even accepting Plaintiff's allegations as true, Plaintiff cannot show that these facts have any relationship to the state of Alabama.[5] Thus, for the reasons explained below, J&J cannot be subject to personal jurisdiction in Alabama based on its peripheral involvement with Johnson's Baby Powder.

As an initial matter, Plaintiff has not pointed to any contacts J&J created with Alabama. In analyzing whether Plaintiff's injury arises out of a contact between J&J and Alabama, the court must focus on the contacts the *defendant* creates with the forum state, not the plaintiff's contacts with the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added). The simple fact that Plaintiff bought and used the product in Alabama, and was subsequently injured in Alabama, does not show that J&J had a sufficient connection to the forum. *See Id*. at 290

---

[5] For example, the talc mine that Plaintiff alleges J&J owned is located in Vermont—not Alabama. (Doc. # 88 at 6). But even if the mine was located in Alabama, this would not win the day for Plaintiff because she has presented no arguments indicating that she was injured by the talc that was sourced from that particular mine. Thus, Plaintiff still could not show that her injury has any relationship to the source location of the talc, even if that location were in Alabama.

(rejecting a similar jurisdictional assertion because "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way").

Although the record evidence shows that J&J lacks direct contacts with the State of Alabama, Plaintiff implies in her Complaint that J&J purposefully availed itself of the privilege of conducting activities in Alabama by placing Johnson's Baby Powder, an allegedly asbestos-containing talc product, into the "stream of commerce." (Doc. # 1 at ¶ 8). To be clear, "purposeful availment may be demonstrated if the defendant who placed the item into the stream of commerce engaged in additional conduct, such as designing the product for the forum state; advertising or marketing in that state; or establishing channels for providing advice to that state's residents." *Tomas v. Bayerische Motoren Werke AG*, 2018 WL 6181172, at *3 (N.D. Ala. Nov. 27, 2018). Moreover, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum state." *Blackburn v. Shire US, Inc.*, 2018 WL 2159927, at *5 (N.D. Ala. May 10, 2018) (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011)). Thus, Plaintiff must show that J&J "deliberately engaged in significant activities within [Alabama] or created continuing obligations with residents of that forum." *Id.* (citing *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1268 (11th. Cir. 2010)).

Regardless of whether J&J or its subsidiaries (Windsor or JJCI) acted as the "manufacturer" for the purposes of the court's jurisdictional analysis, Plaintiff has not advanced a single theory as to how J&J -- through its own actions -- targeted the Alabama market. First, the talc mine that J&J allegedly owned was located in Vermont. (Doc. # 88 at 6). Second,

whether J&J or any of its subsidiaries was the entity that sourced the talc is also of no consequence, again, because none of these activities occurred in Alabama or were directed at Alabama. Third, there is no evidence that J&J designed a marketing campaign targeted at Alabama consumers. With respect to Plaintiff's claim under the AEMLD that J&J was a supplier of the allegedly contaminated talc, neither party seems to dispute that the supply of talc (whether supplied by J&J or its subsidiary, Windsor Minerals) came from the Windsor Mine in Vermont.[6] Given these facts, Plaintiff has failed to show that J&J deliberately targeted the Alabama market for purposes of personal jurisdiction.

In short, Plaintiff has presented no arguments indicating that her injury arises from a contact between J&J and Alabama or that J&J had any purposeful relationship with the State of Alabama. Consequently, Plaintiff has failed to establish the existence of personal jurisdiction over J&J based on J&J's conduct within the forum. Her arguments in favor of this court's jurisdiction over J&J based on its post-May 19, 1979 conduct simply challenge J&J's assertions that its subsidiaries are the responsible entities for Johnson's Baby Powder. Consequently, these arguments are more properly considered within the context of a corporate veil-piercing analysis, addressed below.

### iii. Plaintiff Cannot Pierce the Corporate Veil to Impute JJCI's Contacts with Alabama to J&J as the Parent Company

As an alternative means of establishing personal jurisdiction, Plaintiff argues that the court should pierce the corporate veil between J&J and its subsidiary, JJCI, to attribute JJCI's

---

[6] Plaintiff halfheartedly argues that Windsor is not a separate subsidiary company because (1) J&J owned all the stock of the company, (2) J&J was the entity that sold Windsor, and (3) J&J filed joint income tax returns and required Windsor employees to comply with J&J corporate policies. (Doc. # 88 at 22-23). She does not, however, frame her argument in a manner consistent with corporate veil-piercing principles. In fact, based on the jurisdictional record before the court, she has not even attempted to make the threshold showing that this court has personal jurisdiction over Windsor—a precondition for piercing the corporate veil to impute Windsor's Alabama contacts (if any) to J&J. In any event, the court need not decide whether Windsor retained its own corporate identity because Plaintiff has failed to establish that J&J specifically targeted the Alabama market through its own actions.

post-May 19, 1979 contacts with Alabama to J&J. (Doc. # 88 at 23-25). As an initial matter, the court notes that JJCI has not opposed this court's jurisdiction. Thus, the only remaining question is whether the court may pierce the corporate veil between J&J and JJCI to establish personal jurisdiction over J&J. For the reasons stated below, the court finds that J&J cannot be subject to personal jurisdiction in Alabama based on corporate veil-piercing because the record demonstrates that J&J and JJCI maintained sufficiently separate corporate identities.

Generally speaking, when a "subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary." *Cahaba Disaster Recovery, LLC v. DRC Emergency Servs., LLC*, 2015 WL 9489911, at *3 (N.D. Ala. Dec. 30, 2015) (quoting *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000)). That being said, "it is compatible with due process for a court to exercise personal jurisdiction over [a corporation] that would not ordinarily be subject to personal jurisdiction in that court when the...corporation is an alter ego...of a corporation that would be subject to personal jurisdiction in that court." *Id*. at *3 (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002)).

Both parties have looked to Alabama veil-piercing law in advancing their arguments. Under Alabama law, a plaintiff must establish three elements to justify piercing the corporate veil under an alter ego theory:[7]

> (1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the

---

[7] Alabama recognizes three theories of corporate veil-piercing: "(1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; or (3) operation of the corporation as an instrumentality or alter ego." *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334 (Ala. 1991). Plaintiff relies on the third category to argue that JJCI was a mere instrumentality or alter ego of J&J. Accordingly, the court only addresses this third theory of corporate veil-piercing.

time of the attacked transaction the subservient corporation had no separate mind, will or existence of its own;

(2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed; [and]

(3) The misuse of this control proximately cause[d] the harm or unjust loss complained of.

*Cahaba Disaster Recovery, LLC*, 2015 WL 9489911 at *4 (quoting *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334–35 (Ala. 1991)).[8]

The control required by the dominance prong "amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Kwick Set Components, Inc. v. Davidson Indus., Inc.*, 411 So. 2d 134, 137 (Ala. 1982) (internal quotations omitted). Alabama courts also consider the following factors in determining whether a subsidiary corporation is a "mere instrumentality" of the parent corporation:

(a) The parent corporation owns all or most of the capital stock of the subsidiary.

(b) The parent and subsidiary corporations have common directors or officers.

(c) The parent corporation finances the subsidiary.

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

---

[8] Plaintiff addresses only the first element required to pierce the corporate veil. She makes no argument with respect to the second and third elements. Although one court in this district has found that the "misuse of control element" need not be considered in a jurisdictional analysis, a more recent decision of this court has decided otherwise. *Compare Comeens v. HM Operating, Inc.*, 2014 WL 12650102, at *6 (N.D. Ala. Dec. 1, 2014) (accepting plaintiffs' allegations of alter-ego jurisdiction despite failure to allege any "misuse of control"), *with Cahaba Disaster Recovery, LLC*, 2015 WL 9489911 at *5 (applying the "misuse of control" element in rejecting plaintiff's assertion of alter-ego jurisdiction). However, the court need not decide whether all three elements apply in a jurisdictional analysis, because Plaintiff has failed to successfully make the threshold showing that J&J completely controlled and dominated JJCI so that JJCI lacked an existence of its own.

(e)     The subsidiary has grossly inadequate capital.

(f)     The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(g)     The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h)     In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i)     The parent corporation uses the property of the subsidiary as its own.

(j)     The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k)     The formal legal requirements of the subsidiary are not observed.

*Duff v. Southern Ry. Co.*, 496 So. 2d 760, 763 (Ala. 1986). This list is non-exhaustive, and no single factor is dispositive. *Id*.

J&J again relies on French's affidavit to support its assertion that J&J and JJCI maintained separate corporate identities. (Doc. # 71-1). French's affidavit provides that J&J and JJCI are completely separate legal entities whose corporate relationship is one of parent-subsidiary; they manage and operate their own day-to-day business activities and maintain separate boards of directors and officers; and JJCI is not referred to as a department or division of J&J. (*Id*. at 4). French also asserts that J&J and JJCI are financially independent of each other in that JJCI is fully capitalized and prepares its own financial statements and budgets. (*Id*.). J&J does not pay for any of JJCI's "research, salaries, raw materials, or other operating expenses." (*Id*.). Furthermore, the companies maintain separate "by-laws, minutes, corporate records, financial records, and bank accounts." (*Id*.). French does concede, however, that J&J and all of

its subsidiaries "file some government-mandated consolidated financial reports, such as Annual Reports on Form 10-K under the Securities Exchange Act of 1934." (*Id.*).

In response, Plaintiff contends that J&J exercises complete control and domination over JJCI because (1) JJCI does not have a separate board of directors and is overseen by the board of J&J, (2) JJCI is referred to as a "division" or "business unit" of J&J, and (3) J&J uses its own corporate name to publicly promote and defend Johnson's Baby Powder. (Doc. # 88 at 23-25). The court finds that each of these arguments is insufficient to justify piercing the corporate veil to exercise personal jurisdiction over J&J.

### 1. Plaintiff's Contention that JJCI Does Not Have an Independent Board of Directors and is Overseen by the Board of J&J is Without Merit.

To cast doubt on French's assertion that JJCI maintains its own independent board of directors, Plaintiff offers testimony French gave in a prior deposition in *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2738 ("MDL No. 2738"). (Doc. # 88-4). When asked whether JJCI had a board of directors, French responded, "They have a leadership team, not a sort of independent board and with respect to the board of directors." (*Id.* at 13). However, in the telephone deposition French gave in this case, she clarified the term "leadership team."

> A:     For each of our operating companies that sell our products in all of our sectors, they have really their own, say, board of directors. But in recent years, based just in the world of corporate governance, when you refer to the "board of directors," it generally refers to sort of oversight bodies that have independent or nonaffiliated directors.
>
> …
>
> A:     Okay. To be clear, really currently we refer to Johnson & Johnson as having a board of directors and our operating companies as having management committees or leadership teams.

As we look at historic records, likely those management teams or leadership teams would have been referred to as board of directors as well. And just to be clear, **the role is really the same**. **It's the terminology that has really changed over time.**

Q:      Okay. So to be clear, Johnson & Johnson Consumer, Inc. does not today have something that is referred to as a board of directors. Correct?

A:      Yes. We refer to it as a leadership team or a management committee.

(Doc. # 88-4 at 9-11) (emphasis added). These semantics do not change the fact that the JJCI leadership team manages that subsidiary and functions like a board of directors. This testimony is consistent with the affidavit French provided in this case stating J&J and JJCI maintain independent boards of directors with separate by-laws, minutes, corporate records, etc. (Doc. # 71-1). Consequently, the court agrees with J&J and finds that "Plaintiff [has failed] to establish the premise of her argument—that JJCI has no board of its own." (Doc. # 98 at 14).

As to J&J's oversight role over JJCI, Plaintiff submits the following testimony from French's deposition in MDL No. 2738:

Q:      Okay. And so are the products that are made by JC – JJCI, are they overseen by the J&J board of directors?

A:      The entire business of Johnson & Johnson is overseen by the board of Johnson & Johnson.

…

So JJCI is one component of our business…and part of their purview.

Q:      So the directors of Johnson & Johnson's Board have oversight of all the business, including all the products of JJCI?

A:      That is correct.

…

Q:      All right. If the board says to management, "You need to do this," the management will have to do it, right?

…

A:      I would say they provide **guidance**. It's very clear here what their responsibility is.

They provide oversight to the operations of the company and exercise business judgment on **matters of critical and long-term significance** to the company in furtherance of what they reasonably believe to be in the best interest of the company.

(Doc. # 88-4 at 13-14) (emphasis added). Thus, the undisputed testimony is that J&J does not control the day-to-day business decisions of JJCI. Further, and in any event, the court notes that "a parent corporation can be directly involved in the activities of its subsidiaries without incurring liability if the involvement is consistent with the parent's investor status." *Stevens v. Reliance Fin. Corp.*, 2014 WL 631612, at *8 (M.D. Ala. Feb. 18, 2014) (quoting *Vogt v. Greenmarine Holding, LLC*, 2002 WL 534542, at *6 (N.D. Ga. Feb. 20, 2002)). "Such parental involvement could include monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Id.* (internal quotations omitted). The level of oversight French described is more consistent with the "bigger-picture" oversight allowed in the above-cited decisions. The record shows that J&J's role is merely one of "guidance" as opposed to direct management of JJCI's day-to-day business operations. Thus, Plaintiff's contention that J&J's board of directors improperly oversees JJCI's business is without merit and does not warrant piercing the corporate veil to exercise jurisdiction over J&J.

### 2.  Reference to JJCI as a "Business Unit" or "Division" of J&J Does Not Demonstrate J&J's Control and Dominion Over JJCI.

Plaintiff draws the court's attention to a statement French made in her deposition in MDL No. 2738 that "the [J&J] board understands the business strategy of the consumer division"

(referring to JJCI). (Doc. # 88-4 at 34-35). However, a closer examination of the broader context of that statement makes clear that French was explaining the distinction between J&J's overall awareness of its subsidiaries' actions and JJCI's day-to-day management of its affairs. For example, when asked whether J&J developed a business strategy for talcum powder safety, French responded as follows:

> A:    And the company [presumably, JJCI] would be responsible for developing strategies about really the health and safety of all of our products, what would be an appropriate label, and the other day-to-day management operations.
>
>    The board [of J&J] is informed of those strategies. It is informed of key risk points. But the board itself does not develop strategies. That is not within the role of the board of directors.
>
> …
>
> A:    It is not the role of the board to develop strategies for a specific product of J&J. The role of the board is overall, really, I guess reviewing the overall sort of risk assessment for the company as a whole as a representative of the shareholders.

(Doc. # 88-4 at 35). As previously discussed, the parent company "must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will or existence of its own." *Cahaba Disaster Recovery, LLC*, 2015 WL 9489911 at *4. French's testimony actually demonstrates the exact opposite. JJCI develops its own business strategies, while J&J examines those strategies on a more global level in the context of the health of the company as a whole. Plaintiff has failed to show that J&J exerts complete control and dominion over JJCI such that its day-to-day business practices are absorbed by its parent company.

Finally, the court notes that JJCI has existed as a "separate economic entity since January 2, 1979." (Doc. # 98 at 16). French's affidavit provides that beginning in 1972, "Johnson & Johnson Baby Products Company, a Division of Johnson & Johnson, was the responsible entity

for Johnson's Baby Powder." (Doc. # 71-1 at 3). On January 2, 1979, JJCI (formerly doing business as Johnson's Baby Products Company) became a wholly-owned subsidiary of J&J. (*Id*.). In this context, French's reference to a "consumer division" of Johnson & Johnson is insufficient evidence of J&J's alleged dominion or control over JJCI. Thus, the court declines to pierce the corporate veil to exercise personal jurisdiction over J&J on these grounds.

### 3. Evidence of a Common Marketing and Branding Scheme Does Not Demonstrate J&J's Control and Dominion Over JJCI's Daily Operations.

Plaintiff has produced a series of exhibits in support of her argument that J&J "actively presents itself to consumers as the company behind Johnson's Baby Powder." (Doc. # 88 at 23-24). These exhibits include photos of bottles of Johnson's Baby Powder bearing J&J's name (Doc. # 88-13); photos of J&J's trademark that appears on the bottles (Doc. # 88-14); a television commercial for Johnson's Baby Powder bearing J&J's name (Doc. # 88-17); examples of social media pages referencing only J&J, not JJCI (Doc. # 88-16); and J&J's public statements referring to Johnson's Baby Powder as "our product" and "our talc" (Doc. # 88-10). However, as explained below, the use of a common marketing image is not dispositive of a parent company's complete control and dominion over its subsidiary.

Courts have consistently rejected similar arguments in declining to pierce the corporate veil for purposes of personal jurisdiction. For example, in *Goldthrip v. Johnson and Johnson*, 2016 WL 7472156, at *7 (S.D. Ala. December 8, 2016), the court found that a J&J subsidiary's use of J&J's name on its logo was insufficient proof that the subsidiary was an alter ego of J&J. Likewise, in *In re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, "[t]he common marketing image and joint use of trademarked logos" failed to render the subsidiary an alter ego of its parent. 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010). The court reasoned that while "[related

companies may be] portrayed as a single brand to the public…this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries." *Id.*; *see also Horowitz v. AT&T Inc.*, 2018 WL 1842525, at *9 (D.N.J. April 25, 2018) (same); *In re Chinese-Manufactured Drywall Products Liability Litig.*, 168 F. Supp. 3d 918, 937-38 (E.D. La. 2016) (same); *Seiko v. Epson Corp. v. Print-Rite Holdings, Ltd.*, 2002 WL 32513403, at *15 (N. Or. Apr. 30, 2002) (same).

Moreover, as J&J notes, a parent company is entitled to claim its subsidiary's successes on a public forum without jeopardizing their separate corporate identities. (Doc. # 98 at 18). *See Am. Trading & Prod. Corp. v. Fischbach & Moore, Inc.*, 311 F. Supp. 412, 416 (N.D. Ill. 1970) (a parent company's "boastful advertising" in a magazine does not "show in any way that corporate identities were otherwise ignored by the participants in the conduct of their enterprises"). By that same logic, it follows that a parent company may also publicly defend the actions of its subsidiaries because such public displays of corporate accountability do not resemble complete control and dominion over the day-to-day operations of the subsidiary. Again, these grounds are insufficient to justify piercing the corporate veil to impute JJCI's contacts to J&J.

Plaintiff has failed to demonstrate that J&J exercised complete control and dominion over JJCI. Consequently, the court declines to pierce the corporate veil between the two companies in order exercise personal jurisdiction over J&J.

## IV.    Conclusion

For the reasons explained above, Defendants' Motions to Dismiss for Lack of Jurisdiction (Docs. # 69, 71) are due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this February 25, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE